BOEHM, J.,
dissenting.
The issue before us is whether Norman Timberlake is insane within the meaning of the Eighth Amendment prohibition against execution of an insane person. This requires an assessment of his current mental condition. We are not concerned with his insanity at the time of the offense, which is judged by a different formulation of "insanity." Nor is the issue his ability to understand the proceedings and participate in the defense at the time of his trial.
I agree with the majority that it seems clear that Timberlake understands that he is to be executed for the murder of Trooper Greene. He therefore is not insane as that term is explained in Justice Powell's concurring opinion in Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986). As I stated in dissenting in Baird v. State, 833 N.E.2d 28, 34 (Ind.2005), I am not confident that the Ford standard will ultimately prove to be the test for eligibility to be executed consistent with the Eighth Amendment. I concede that most federal and state courts have taken Justice Powell's standard as the current interpretation of the Eighth Amendment. But the Ford formulation has never been squarely adopted by the U.S. Supreme Court, and subsequent decisions of that Court have cast some doubt on it. We are bound by U.S. Supreme Court precedent, but nothing prohibits a state from acting more cautiously in applying the death penalty if there is genuine doubt as to the long term viability of the dominant understanding of current precedent from that Court.
The Ford formulation of the Eighth Amendment standard of insanity was offered by Justice Powell in his separate concurrence. Three years after Ford, the Supreme Court held that executions of mentally retarded persons and juveniles were permissible under the Eighth Amendment. Stanford v. Kentucky, 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989) (juveniles); Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (mentally retarded); In Penry, Justice O'Connor, writing for herself, Chief Justice Rehnquist, and Justices White, Scalia, and Kennedy, quoted Justice Powell's standard, and many state and federal courts have taken this as a definitive endorsement of that language by the Supreme Court. This language is not, however, a square holding that is entitled to complete deference as a definitive ruling of the Supreme Court. Only Justice Powell, who provided the fifth and deciding vote in Ford, embraced that formulation in that case. The reference in Penry is a description of Ford in a case upholding execution of a mentally retarded person, where the standard for insanity was not an issue. I agree that many courts have taken the Penry language as an endorsement of the Powell formulation by a majority of the Supreme Court. I nonetheless note that the Penry description is as susceptible of being read as a minimum standard, without necessarily formulating the precise standard. In any event it is dicta, not a holding, and the Supreme Court has not spoken since.
More importantly, both Penry and Stanford have now been overruled. See Roper *632 v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (execution of juveniles violates the Eighth Amendment); Atkins v. Virgima, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (execution of the mentally retarded violates the Eighth Amendment). In the course of reexamining Penry and Stanford, more than a majority of the Supreme Court has described the bases for the Eighth Amendment's prohibition against execution of the mentally retarded as "diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." Atkins, 536 U.S. at 318, 122 S.Ct. 2242.
If a person who is not mentally retarded suffers from the same "diminished capacities" it seems equally offensive to the Eighth Amendment to execute that person. We are told that Timberlake believes that a machine is guiding the actions of his jailers and executioners as well as a number of other persons in public life. The machine speaks to him and on occasion tortures him. Dr. Parker concludes that Timberlake is not malingering in these claims. Because Dr. Parker was asked to, and did, opine only as to whether Timberlake met the Ford standard, we have no opinion as to whether Timberlake met any other standard of "insanity." Surely, most ordinary citizens would consider a genuine belief in this machine and its workings to render Timberlake, like Arthur Baird before him, at least on the margins of insanity. It seems clear from Dr. Parker's report that Timberlake has ordinary intelligence and the ability to communicate. Whether Timberlake's belief in this machine leaves him with "diminished capacities" to "understand and process information" or to "engage in logical reasoning" or to "control impulses" seems more debatable.
As I stated in Baird, we should be cautious in carrying out the death penalty because of its irreversibility, whatever we think of its morality. In Baird's case, it seemed to me that the cireumstances of his crime and trial left some question as to whether the death penalty was appropriate, even though it was clear that he met the statutory requirements for eligibility by reason of killing his wife, his mother, and his father. Timberlake engenders no such doubt. He killed a law enforcement officer in the line of duty. Timberlake is nonetheless entitled to the protections of the Constitution of the United States. There is sufficient doubt as to his mental condition that I would permit him to proceed with an adversary proceeding to resolve his eligibility to be executed consistent with the Eighth Amendment.
RUCKER, J., concurs.